Marion Wood HALENDA, Lori Halenda, Individually and as Guardian of M. Zachary L. Hooten, a minor, and Marion Halenda and Lori Halenda, as Guardians of Alexandra Halenda, a minor, Plaintiffs,

and

Colonial Penn Franklin Insurance Company, a foreign corporation, Intervenor, as Subrogee of [a/s/o] Marion Wood Halenda, Lori Halenda, Individually and as Guardian of M. Zachary L. Hooten, a minor, and Marion Halenda and Lori Halenda, as Guardians of Alexandra Halenda, a minor, Plaintiff/Intervenor,

v.

HABITAT FOR HUMANITY INTERNATIONAL, INC., Defendant.

No. 982059CIV.

United States District Court, S.D. Florida.

Jan. 3, 2000.

David Stone, Davie, FL, for plaintiffs.

Michael Knecht, Palm Beach Gardens, FL, for plaintiff/Intervenor.

James Redmond, Coral Gables, FL, for defendant.

### ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon the following motions:

(1) Defendant Habitat for Humanity International, Inc.'s motion for summary final judgment; and

**1.** In an order dated March 4, 1999, the Court addressed and rejected Colonial Penn's argument that removal had been untimely.

(2) Plaintiffs' motion for partial summary judgment.

For the reasons stated below, the Court grants the defendant's motion and denies the plaintiffs' motion.

### PROCEDURAL BACKGROUND

On October 20, 1997, Plaintiffs Marion and Lori Halenda, on behalf of themselves and M. Zachary L. Hooten and Alexandra Halenda, the two minor children in the Halenda family, commenced this action in the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida. The case arises from a motor vehicle accident involving the Halenda family and Jack and Lois Wolters, which occurred on December 26, 1996, near Naples, Florida. At the time of the collision, Lois Wolters was employed by Defendant Habitat for Humanity International, Inc. ("HFH"). The Halendas seek to recover damages sustained in the accident from HFH under the theory of vicarious liability.

On August 28, 1998, HFH removed the action, based on diversity jurisdiction. Prior to removal, Colonial Penn Franklin Insurance Company ("Colonial Penn"), the Halendas' insurer, had been permitted to intervene in the action. colonial Penn, as subrogee, seeks to recover from HFH insurance proceeds totaling $400,000 paid to the Halendas as a result of the accident.[1]

The Halendas and HFH have now filed cross-motions for summary judgment on the issue of HFH's purported vicarious liability.[2] HFH seeks final judgment on the basis that it is not vicariously liable for the conduct of Jack Wolters, who was the driver of the Wolters' vehicle at the time of the accident, nor that of his wife Lois Wolters, a passenger in the vehicle. The Halendas seek a partial summary judgment that HFH is vicariously liable for the damages caused by the negligence, *if any,* of Lois and Jack Wolters.[3]

**2.** Colonial Penn has not participated in the briefing of this matter.

**3.** The Halendas specify that their motion does not address the issues of negligence, causa-

### UNDISPUTED ISSUES OF MATERIAL FACT

1. In the afternoon of December 26, 1996, the members of the Halenda family (Marion, Lori and Alexandra Halenda and Zachary Hooten) were the occupants of a 1994 Ford automobile driven by Marion Halenda westbound on U.S. Route #41, approximately 30 miles east of Naples, Florida.

2. At that time, Jack Wolters was driving on the same highway, in an eastbound direction, a 1988 Chevrolet Suburban and pulling a 1987 Airstream trailer. Lois Wolters, his wife, was riding in the front passenger seat of the Suburban.

3. Both the automobile and trailer were registered in North Carolina, where Mr. and Mrs. Wolters reside. The Suburban was titled in the name of Jack Wolters only; the Airstream was titled jointly in the names of both Jack and Lois Wolters. Both vehicles had vanity license plates: "HFHGYPSY" on the Suburban; and "HHGYPSY" on the Airstream.

4. The accident giving rise to this action occurred when Jack Wolters went into the westbound lane, attempting to pass a large truck. During the passing maneuver, the trailer fish-tailed and disengaged from the Suburban, thereby colliding head-on with the Halendas' westbound automobile.

5. HFH is a not-for-profit Georgia corporation, whose principal place of business is located in Americus, Georgia. The purpose of HFH is to facilitate the construction of affordable housing. HFH accomplishes this purpose through community-based "affiliates", which are also established as not-for-profit corporations. The affiliate corporations carry out the construction of housing projects through the use of local volunteer labor and the "sweat equity" invested by the prospective home-owners. Another source of volunteer labor for affiliates' housing construction projects is the "R.V. Gypsy" program. The "R.V. Gypsies" travel in caravans to participate in affiliates' projects, using their personally-owned recreational vehicles as temporary housing.

6. The Wolters first became associated with HFH in the late 1970's or early 1980's, when they met HFH founder Millard Fuller. After participating in a housing project in Immokalee, Florida, both Lois and Jack became volunteers for HFH. Over the course of ten years, they traveled to housing projects in different parts of the United States.[4]

7. On December 26, 1996, when the accident between the Halendas and the Wolters occurred, Lois Wolters was a full-time employee of HFH, working as coordinator of the "R.V. Gypsy" program. She had held that position with HFH since April, 1993.[5]

8. As part of her duties, Lois produced a newsletter, the "Care–A–Vanner". In various pre-accident issues of the newsletter, instructions appear to "contact Jack & Lois Wolters" at a given telephone number for further information regarding upcoming caravans.

9. Lois' compensation from HFH consisted of an annual salary, which was at the level of $17,668.80 per annum as of April 1, 1996. In addition, Lois received reimbursement for out-of-pocket expenses, such as mileage, postage, telephone and duplicating costs.

10. Lois conducted her work for HFH from her home in North Carolina. When she was on the road participating in an "R.V. Gypsy" caravan, Lois maintained her

---

tion and damages, as well as any other possible defenses raised by HFH. As more fully discussed below, however, the Court finds it necessary to address the predicate issue of negligence, particularly with regard to Lois Wolters.

**4.** The Wolters have also participated in housing projects in several foreign countries.

**5.** In its motion for summary judgment, HFH states that, "Lois Wolters is assumed for purposes of this Motion to be an employee of [HFH] and at all times material acting within the scope and time of her employment."

records and attended to her duties from the trailer she and her husband used as temporary housing.

11. Jack Wolters was not an employee of HFH on December 26, 1999, nor has he ever been paid a salary by HFH. However, Jack has been reimbursed for out-of-pocket expenses, including mileage, food and telephone, incurred while performing volunteer work for HFH.

12. In the fall of 1996, Jack and Lois participated in the "Arkansas and Texas Trails" caravan of the "R.V. Gypsy" program. At the conclusion of that caravan in San Antonio, Texas, the Wolters stopped at two affiliate job sites in Louisiana. From there, they traveled to Fort Myers, Florida to spend Christmas with friends. On the date of the accident, the Wolters were en route to Key Largo, Florida, to participate in a construction project sponsored by HFH's Upper Keys Affiliate.

13. After the accident, the Wolters remained in Florida for a period of time, while Lois convalesced from injuries she sustained.

14. On February 10, 1997, Lois Wolters submitted a voucher to HFH for reimbursement of $1,001.63 for the following expenses incurred "en route to Key Largo HFH": $540.96 for mileage (1,932 miles); $441.43 for telephone charges (3 months); and $19.24 for miscellaneous. This amount was paid by HFH on March 13, 1997.

15. On April 30, 1997, Lois Wolters submitted a voucher to HFH for reimbursement of $420.71 for the following expenses incurred to "return home from Fall/Winter Caravan": $269.08 for mileage (961 miles "from FL back to NC"); $128.89 for telephone charges; and $22.74 for miscellaneous. This amount was paid by HFH on May 7, 1997.

16. The Wolters did not maintain separate bank accounts. Therefore, these reimbursements to Lois may be deemed to have been deposited in their joint account.

## DISCUSSION

As previously noted, the issue before the Court is whether HFH is vicariously liable for the damages claimed by the Halenda family as a result of their December 26, 1996, automobile accident with the Wolters. As pled in their complaint, the Halendas predicate their vicarious liability theory on the alleged negligence of Jack Wolters, the driver of the Suburban with the attached Airstream trailer. In the instant motion, however, the Halendas seek a judgment that HFH is vicariously liable for the damages caused by the negligence, *if any*, of Lois and Jack Wolters. Even though this theory of liability was not pled, the Court first considers the Halendas' arguments with respect to Lois. Thereafter, the Court addresses the arguments regarding Jack.

■ The Halendas rely on a portion of Jack's deposition testimony to assert that Lois may be found negligent on the basis of her own conduct prior to the accident. According to Jack, after he pulled out of the eastbound lane to pass the large truck ahead of him, both he and Lois looked down the road and noted that the westbound lane was clear, except for what later turned out to be the Halendas' vehicle, in the far distance. Jack further testified that, at that point, Lois said to him that "it was clear"; and that he understood the meaning of her statement as, "Not about the weather, it was about the fact that it was clear in sight as far as me passing." Once he moved onto the westbound lane, Jack realized, for the first time, that there was a little car ahead of the truck. After slowing down initially, he attempted to pass the little car, since there was no room to squeeze between it and the truck. At that point, the trailer fish-tailed and the accident ensued.[6]

---

**6.** During her deposition, Lois was asked if she had told Jack it was okay to pass the truck. Lois testified that she had not. Therefore, an issue of fact exists regarding Lois' alleged statement to Jack. Because the Halendas seek a ruling that HFH is vicariously liable for the negligence of Lois, if any, the Court assumes the truth of Jack's testimony for purposes of

Lois' statement to Jack that "it was clear", without more, does not provide a sufficient basis for imputing independent negligence upon Lois. Since she was not the driver of the car, Lois had no duty of reasonable care that she could have breached by informing Jack that the westbound lane "was clear". An alternative approach is to impute Jack's negligence to Lois. According to the Supreme Court of Florida, "the rule is that the negligence of the driver of an automobile is not in general imputable to a passenger who has no authority or control over the car or the driver." *Bessett v. Hackett*, 66 So.2d 694, 698 (Fla.1953). Nevertheless,

> An exception to the general rule that a guest riding in an automobile is entitled to trust the vigilance and skill of the driver arises where the passenger knows, or by the exercise of ordinary and reasonable care should know, from the circumstances of the occasion, that the driver is not exercising that degree of care in the operation of the vehicle compatible with the safety of his passenger. In such case it become the duty of the guest to make some reasonable attempt through suggestion, warning, protest or other means suitable to the occasion, to control the conduct of the driver. However, before the duty to warn, protest, or take other such action suitable to the circumstances of the case, arises, it is necessary that the occupant should know or have reason to know that it is reasonably essential to his own safety to attempt to warn or to control the conduct of the driver, and there must be sufficient time and opportunity for the guest to give warning or make protest before the happening of the accident; for a guest in an automobile may know at a particular time what the driver is doing, yet have no reason to realize that

it is necessary that he intervene for his own safety.

*Bessett*, 66 So.2d at 698–99.

This theory of liability was considered by the Second District Court of Appeals in *Sisam v. Brantley*, 366 So.2d 1195 (Fla. 2d DCA 1979). There, a jury found that the injuries sustained by a twelve-year-old girl in an automobile accident were due 60% to her own negligence. The girl was riding as a passenger in a car driven by her mother. As the mother advanced across an intersection, the car was struck on the passenger side by defendant's automobile, resulting in serious injuries to the girl. There was testimony at trial that when the girl rode with her mother as a passenger, she would sometimes inform the mother of oncoming traffic. However, there was no evidence that she had done so prior to the accident; and both the mother and daughter testified that they had not seen the oncoming car. Moreover, there was no suggestion that the mother was driving recklessly. The Second Circuit concluded that the jury improperly imputed the mother's negligence to the girl because, under the circumstances, the girl had no duty to warn her mother.

Similarly, the facts of this case, viewed in the light most favorable to the Halendas, do not support application of the *Bessett* exception.[7] Jack solicited and received Lois' visual input in the process of passing the truck. Lois' perception was that the westbound lane was clear for passing. Therefore, she had no reason to warn her husband not to pass. Moreover, nothing in the record supports an inference that Jack was driving recklessly or acting in a way that would have made it reasonably essential to her own safety for Lois to attempt to warn or to control Jack's conduct. Hence, the Court concludes that Jack's negligence is not imputable to Lois under the *Bessett* exception.

---

addressing the Halendas' argument. Obviously, Lois' version of the events would not trigger further analysis.

7. Again, the Court assumes, for purposes of ruling on the parties' cross-motions, the truth of Jack's version of the events.

The Halendas also rely on the "joint enterprise" doctrine to impute negligence to Lois for the accident. In *Kane v. Portwood*, 573 So.2d 980 (Fla. 2d DCA 1991), after doubting the continued vitality of this theory of liability in the context of a modern tort action, the Second District Court of Appeals distinguished the doctrine from the concepts of "joint venture" or "joint adventure". Noting that the latter are terms used to describe a type of business relationship, the court stated, "By contrast, a joint enterprise is a nonbusiness relationship. Florida Standard Jury Instructions (Civil) 3.3e and 3.3f recognize this distinction and limit the use of the joint enterprise instructions to cases involving automobile liability." *Kane*, 573 So.2d at 982.

■ The existence of a joint enterprise requires proof of the following elements: "1) an agreement, express or implied, to enter into an undertaking, 2) a community of interest in the objects and purposes to be accomplished in the undertaking, and 3) equal authority to control the undertaking." *Id.* at 985. In this case, there is sufficient evidence from which a jury could find that Mr. and Mrs. Wolters were engaged in a joint enterprise at the time of the accident, namely, participation in the construction project sponsored by HFH's Upper Keys Affiliate. Therefore, the Court proceeds with its analysis of this theory of liability, guided by the *Kane* opinion.

■ According to the *Kane* court, the joint enterprise doctrine has been used extensively by Florida courts as a way to avoid the harsh results of the guest passenger statute.[8] A second historical application of the doctrine has been to impute a driver's negligence to his passenger, thereby, through contributory negligence, precluding the passenger from recovering against a negligent third-party.[9] A third use of the theory, which is the variety involved in this case, is to make a passenger liable, as a defendant, to third parties for the negligence of the driver. According to the *Kane* court, this application has seldom been employed in other jurisdictions and has not been utilized in Florida. The *Kane* court further cautioned, "This opinion should not be interpreted as approving such a variety of joint enterprise." *Id.* at 983. Heeding this caveat, the Court declines to apply the joint enterprise doctrine to impute upon Lois, as passenger, the negligence of her driver, Jack.

■ Having addressed the various potential theories of liability with respect to Lois, the Court finds no merit in any of them. Hence, there is no basis for imposing vicarious liability upon HFH for the negligence of its employee, Lois. The Court next considers the Halendas' arguments that HFH is vicariously liable for Jack Wolters' negligence.[10]

■ The Halendas argue that, even though Jack was not a paid employee of HFH, he was nevertheless its agent. With regard to actual or implied agency, a review of the undisputed facts reveals that they do not support such a theory. Jack

8. Proving the existence of a joint enterprise between the driver and his passenger negated the passenger's guest status, thereby enabling him or her to recover for the negligence of the driver. In light of the repeal of the guest statute, the *Kane* court considered this application "a remnant of the past." *Id.* at 983.

9. The *Kane* court questioned the validity of this theory in the current context of comparative negligence and contribution among joint tortfeasors.

10. The Halendas also appear to argue that Lois' use of the Airstream trailer to perform her job duties for HFH while on the road, in some fashion, conferred responsibility for that vehicle upon HFH. They characterize the trailer as the "mobile headquarters for the 'R.V. Gypsy'" program. As previously noted, the trailer was owned by the Wolters. Therefore, there is no basis for the Halendas' apparent attempt to invoke Florida's dangerous instrumentality doctrine. In any event, the Airstream trailer was not being propelled on the road by its own power. Rather, it was being pulled by the Suburban. *See Pullman, Inc. v. Johnson*, 543 So.2d 231 (Fla. 4th DCA 1987) (trailer portion of a tractor-trailer rig is not a dangerous instrumentality).

had been a long-time volunteer in construction projects sponsored by HFH affiliates. At the time of the accident, Jack was on his way, together with his wife Lois, to one such project. He was driving his solely-owned Chevrolet Suburban and pulling an Airstream trailer jointly owned with Lois. Although he had been reimbursed for out-of-pocket expenses for past volunteer endeavors, the expenses for this trip were submitted by and reimbursed to Lois. The Wolters' use of a joint household account for depositing monies received from HFH did not transmute the funds into compensation to Jack. Therefore, there is no indicia in the record of an agency relationship between HFH and Jack Wolters.

Moreover, the "volunteer" cases from Florida courts relied upon by the Halendas are inapposite. In each of those cases, the accident occurred while the volunteer was rendering a service on behalf of the party held vicariously liable. In this case, Jack was not in the process of rendering a volunteer service, rather he was on his way to do so.[11]

Thus, there is no evidentiary predicate in the record for a jury to find that Jack Wolters was either an actual or implied agent of HFH. An alternative theory, apparent agency, requires proof of the following elements: (1) a representation by HFH to the Halendas; (2) reliance on that representation by the Halendas; and (3) a change in position by the Halendas, in reliance upon the representation by HFH. *See Mobil Oil Corp. v. Bransford,* 648 So.2d 119, 121 (Fla.1995). The Wolters' selection of vanity plates with the ciphers "HFHGYPSY" and "HH–GYPSY" for their vehicles does not constitute a representation on the part of HFH to the Halendas or anyone else. The various references to "Jack & Lois Wolters" in the Care–A–Vanner newsletter did not consti-

tute a representation to the Halendas, who did not receive the newsletter. Moreover, there is no evidence in the record of reliance or a change in position on the part of the Halendas. Therefore, there is no predicate for application of the theory of apparent agency to this case.

## CONCLUSION

In its analysis, the Court has examined and rejected the various theories advanced by the Halendas for imputing negligence upon HFH's employee, Lois Wolters. Absent negligence on the part of Lois, there is no vicarious liability to impose upon HFH for her conduct. The Court has also considered and rejected the Halendas' arguments for imposition of vicarious liability upon HFH for the negligence of Jack Wolters. Therefore, the Court concludes that HFH is not vicariously liable, as a matter of law, for the damages sustained by the Halendas in the automobile accident underlying this action. Accordingly, it is

ORDERED AND ADJUDGED that Defendant Habitat for Humanity International, Inc.'s motion for summary final judgment is GRANTED and Plaintiffs' motion for partial summary judgment is DENIED. In accordance with Fed.R.Civ.P. 58, the Court shall enter judgment in favor of the defendant by separate order.

---

11. The cases cited by the Halendas involving volunteers driving to meetings or functions were decided by state courts outside of Flori-

da. Those cases are inapplicable to this diversity action, where the Court must apply Florida law.